## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

|  |  |
|---|---|
| JTH TAX, LLC, | |
| Plaintiff, | |
| v. | Case No. 2:22-cv-383 |
| BASSAM YOUNAN d/b/a ZAYA FINANCIAL GROUP, | |
| Defendant. | |

## MEMORANDUM OPINION & ORDER

Before the Court is Plaintiff JTH Tax, LLC's Motion for Preliminary Injunction. ECF No. 3. The Court has reviewed the record in this case, considered arguments from both parties, and determined there is no need to hold a hearing on the motion. *See* Fed. R. Civ. P. 18; E.D. Va. Civ. R. 7(J).[1] For the reasons stated herein, the motion is **DENIED**.

---

[1] "[P]reliminary injunctions are denied without a hearing, despite a request for one by the movant, when the written evidence shows the lack of a right to relief so clearly that receiving further evidence would be manifestly pointless." *Fundamental Admin. Servs., LLC v. Anderson*, No. 1:13-cv-1708, 2015 WL 2340831, at *1 (D. Md. May 13, 2015) (citing 11A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 2949, at 246–48 (2013)). In the instant case, JTH has failed to dispute key allegations in the defendant's opposition brief, which the Court finds forecloses relief. Therefore, a hearing could only change the outcome of the motion if JTH were to present evidence to support arguments it has never made. Thus, the Court concludes it would be "manifestly pointless" to hold a hearing. *Anderson*, 2015 WL 2340831, at *1. *See also Adams v. Applied Bus. Servs.*, No. 2:18-cv-559, 2019 WL 7817080, at *2 (E.D. Va. Aug. 30, 2019) (noting that the "entire purpose of a reply" is for the moving party to "reply to counterpoints made by its opponent in the opposition") (internal punctuation omitted).

## I.    BACKGROUND

Plaintiff JTH Tax, LLC ("JTH") franchises tax preparation businesses nationwide. ECF No. 4 at 2. In 2016, Defendant Bassam Younan entered into two agreements with JTH—one to operate a Liberty Tax franchise and another to operate a SiempreTax franchise. ECF No. 1 ¶ 1; ECF Nos. 1-1 (Liberty franchise agreement), 1-2 (SiempreTax franchise agreement).[2] Pursuant to those agreements, the defendant operated a tax preparation business in North Hollywood, California. ECF No. 1 ¶ 2. JTH terminated the franchise agreements on January 26, 2022. ECF No. 1-6.

On September 13, 2023, JTH filed a verified complaint that included claims for breach of contract, unjust enrichment, and conversion. *See generally* ECF No. 1. Simultaneously, JTH filed the instant motion for preliminary injunction. ECF Nos. 3 (motion), 4 (memorandum).[3] The defendant filed an opposition (ECF No. 42),[4] and JTH replied (ECF No. 44).

---

[2] The parties' two contracts are materially identical except insofar as they refer to JTH as either "Liberty" (in ECF No. 1-1) or "SiempreTax" (in ECF No. 1-2). For simplicity, this Memorandum Opinion and Order will cite the Liberty franchise agreement (ECF No. 1) except where distinguishing between the contracts matters. *See also* ECF No. 42 at 2 (defendant explaining that JTH provided SiempreTax products to "all" its franchisees and that the defendant "never used[d] it or plan[ned] to use it").

[3] On November 18, 2022, the defendant filed a motion to dismiss or, in the alternative, to transfer venue. ECF No. 16. The Honorable Rebecca Beach Smith, to whom this case was previously assigned, stayed briefing on the motion for preliminary injunction pending the outcome of the motion to dismiss or transfer. ECF No. 20. On August 23, 2023, this Court lifted the stay and ordered briefing on the motion for preliminary injunction. ECF No. 41.

[4] When JTH filed this action and the instant motion, the defendant was represented. Defense counsel has since withdrawn. *See* ECF No. 37. The defendant filed his

JTH seeks a preliminary injunction to prohibit the defendant from (1) operating a tax return preparation business within 25 miles of the territories identified in the franchise agreements for a period of two years from the date of the injunction, (2) soliciting any former Liberty or SiempreTax customer within 25 miles of those territories for a period of two years from the date of the injunction, and (3) using any confidential information belonging to JTH. *See* ECF No. 4 at 2.

JTH alleges that, since it terminated the franchise agreements, the defendant has failed to "transfer" or "deliver" to JTH: customers' "names, addresses, e-mail addresses or phone numbers" as well as other unspecified "telephone numbers used in relation to the Franchise Business;" and that the defendant has not "delivered to [JTH] any original and all copies of customer tax returns, files and records" or "return[ed] all copies of [JTH's] confidential Operations Manuals." ECF No. 4 at 6. JTH further alleges the defendant "failed to assign his interest in the lease" for the locations of his former franchises" and "has offered tax preparation services, using the name Zaya Financial Group, at . . . the same location as the former Liberty and Siempre Franchise Location." *Id.*

The defendant asserts that after the franchises were terminated, he removed all JTH trademarks from his business and—as his contracts required (*see* ECF No. 1-1 ¶ 9.f.)—offered to assign his lease to JTH. *See* ECF No. 42 at 2. The defendant

opposition *pro se*. Accordingly, the Court has construed the opposition liberally. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (internal citations omitted); *cf.* Fed. Rule Civ. Proc. 8(f) ("all pleadings shall be so construed as to do substantial justice").

claims that JTH declined to take over the franchise or to retrieve any documents from him (*see id.*), so he has been storing JTH's "files" ever since (*id.* at 3). The defendant states that he has not used JTH's proprietary software since his franchises were terminated and that he has told every former JTH customer who has called his business that "we are not Liberty anymore" and that he "cannot do business with them." *Id.* at 3.

The defendant admits that he breached his non-compete obligations by "fil[ing] tax returns within two years [of termination] from the exact same location as [his] Liberty franchise." ECF No. 44-2 at 8.

## II. LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 25 (2008); *see Mountain Valley Pipeline, LLC v. W. Pocahontas Prop. LP.*, 918 F.3d 353, 366 (4th Cir. 2019). In other words, "such relief is regarded as . . . a 'drastic' use of the court's injunctive power and is never to be granted lightly, but is instead to be used only in limited circumstances which clearly demand it." *Downing v. Lee*, No. 1:16-cv-1511, 2017 WL 11489270, at *2 (E.D. Va. Feb. 13, 2017) (quoting *Tiffany v. Forbes Custom Boats, Inc.*, 959 F.2d 232 (4th Cir. 1992)). A party seeking a preliminary injunction must establish that they are "likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Ramirez v. Collier*, 142 S. Ct. 1264, 1275 (2022); *Winter*, 555 U.S. at 20; *dmarcian, Inc. v. dmarcian Eur.*

*BV*, 60 F.4th 119, 138 (4th Cir. 2023). "Courts considering whether to impose preliminary injunctions must separately consider each . . . factor." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017).

"In the context of a preliminary injunction, where swiftness is a virtue, the district court may rely upon a verified complaint as a basis for an injunction." *In re Patriot's Point Assocs., Ltd.*, Nos. 89-3333, 89-3353, 1990 WL 64718, at *6 (4th Cir. May 2, 1990) (unpublished) (citing *K-2 Ski Co. v. Head Ski Co.,* 467 F.2d 1087, 1088 (9th Cir. 1982); *Flynt Distributing Co. v. Harvey,* 734 F.2d 1389, 1394 (9th Cir. 1984) (urgency of obtaining a preliminary injunction means that trial court may give even inadmissible evidence some weight)); *see also Elrod v. Burns*, 427 U.S. 347, 350 n.1 (1976) (discussed in n.8, *infra*).

## III.   ANALYSIS

The Court has—as it must—"separately consider[ed]" each factor in the preliminary injunction analysis. *Di Biase*, 872 F.3d at 230. JTH has carried its burden with respect to the first element, but it has failed to show that it would likely suffer irreparable harm absent an injunction or that the balance of equities tips in its favor. Because "[e]ach preliminary injunction factor . . . must be satisfied as articulated," *Stinnie v. Holcomb*, 77 F.4th 200, 208 (4th Cir. 2023), the motion will be denied.

### A.   Likelihood of Success on the Merits

While JTH "need not establish a certainty of success" to obtain a preliminary injunction, it "must make a clear showing that [it] is likely to succeed at trial." *Di Biase*, 872 F.3d at 230. For the reasons explained below, the Court finds that JTH is

likely to prevail on its claim for breach of contract.[5] Therefore, the first element of the

preliminary injunction assessment is satisfied.

---

[5] JTH does not argue that it is likely to succeed on any other claim (*see* ECF No. 4 at 8–10, ECF No. 44 at 8–11), and based on undisputed allegations in the defendant's opposition to the instant motion, it is not clear whether it would.

In Virginia, an unjust enrichment claim requires proof that "(1) "[the] plaintiff conferred a benefit on [the] defendant; (2) [the] defendant knew of the benefit and should reasonably have expected to repay [the] plaintiff; and (3) [the] defendant accepted or retained the benefit without paying for its value." *T. Musgrove Constr. Co., Inc. v. Young*, 840 S.E.2d 337, 341 (Va. 2020). Virginia common-law conversion is "any wrongful exercise or assumption of authority over another's goods, depriving him of their possession; and any act of dominion wrongfully exerted over property in denial of the owner's right, or inconsistent with it." *Mackey v. McDannald*, 842 S.E.2d 379, 387 (Va. 2020) (internal citation and punctuation omitted).

JTH's unjust enrichment and conversion claims both arise out of the defendant's alleged use of JTH's "Confidential Information." ECF No. 1 ¶¶ 84 (unjust enrichment), 90 (conversion). According to the parties' contracts, "confidential information" includes but is not limited to "methods of operation, service and other methods, techniques, formats, specifications, procedures, information, systems, knowledge of and experience in operating and franchising offices, customer information and marketing information." ECF No. 1-1 ¶ 12.a.

The defendant alleges—and JTH has not disputed—that he attempted to return "files," "documents," "signs," and "anything belong[ing] to [JTH]." ECF No. 42 at 2. The defendant claims that he called a JTH representative "to discuss how to deliver the files to [JTH]," and that person "advised" the defendant to "call [JTH] and talk to someone regarding [the] matter." *Id.* According to the defendant, he called JTH "three times" at the number JTH "provided" him, but "no [one] respond[ed]." *Id.* The defendant further alleges that, "since the date of the termination letter," he stored "the files" in a "sa[f]e area." *Id.* at 3. According to the defendant, he is not even "[able] to use any [JTH] software," because he lost access when his franchises were terminated. *Id.*

It is clear that JTH "conferred a benefit on [the] defendant" in the form of permission to use its confidential information and that the defendant "knew of the benefit" and "reasonably [should] have expected to repay" JTH for it. *Young*, 840 S.E.2d at 341. But because the defendant alleges that he attempted to return JTH's property, it would appear he did not "*accept*[] . . . the benefit without paying for its value." *Id.* (emphasis added). Indeed, if it is true that the defendant has merely stored his JTH

The parties' franchise agreements contain choice-of-law clauses that dictate Virginia law shall govern all their disputes. *See* ECF No. 1-1 ¶ 17.a. To succeed on a breach of contract claim under Virginia law, a plaintiff must prove "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Filak v. George*, 594 S.E.2d 610, 614 (Va. 2004).

The record contains copies of two executed franchise agreements between JTH and the defendant. ECF Nos. 1-1, 1-2. The defendant does not dispute that he signed the contracts or that their terms are enforceable. *See generally* ECF No. 42 (defendant's opposition). The contracts establish a series of obligations that survive after termination of the agreements. The defendant is obligated to:

- "Transfer to [JTH] all telephone numbers . . . used in relation to the Franchised Business" (ECF No. 1-1 ¶ 9.e.);

- "Deliver to [JTH] . . . lists . . . containing the names, addresses, e-mail addresses, or phone numbers of customers of the Franchised Business" (*id.* ¶ 9.g.);

- "Deliver to [JTH] . . . customer tax returns, files, and records (*id.* ¶ 9.h.)"; and

---

files since the date his franchises were terminated (*see* ECF No. 42 at 3), it is unclear whether has "retained" any "value" conferred by JTH at all. *Young*, 840 S.E.2d at 341.

Similarly, if the defendant attempted to return JTH's confidential information as he claims, but JTH did not accept the materials, then the defendant may have committed no "wrongful exercise . . . of authority" over JTH's property, *Mackey*, 842 S.E.2d at 387—rather, his alleged storage of JTH files in a "sa[f]e area" (ECF No. 42 at 3) would be *consistent* with "the owner's right," not "inconsistent with it." *Mackey*, 842 S.E.2d at 387.

- "[N]ot directly or indirectly, for a fee or charge, prepare or electronically file income tax returns, or offer Financial Products," for two years following termination of the franchise (*id.* ¶ 10.b.).

In a deposition taken July 7, 2023, the defendant admitted that he breached his obligations under the franchise agreements by "fil[ing] tax returns within two years [of termination] from the exact same location as [his] Liberty franchise." ECF No. 44-2 at 8. Specifically, the defendant admitted that he filed "approximately 50 individual tax returns" and "approximately another 20 to 30 business returns" in 2022 and "approximately 50 individual tax returns" and "20 or so business returns" in 2023—all after termination of the franchise agreement. *Id.* at 5–6. Again in his opposition, the defendant admitted that he "stayed in the same location" and "ke[pt] doing . . . tax return[s]." ECF. No. 42 at 2.

In its verified complaint, JTH also states that the defendant failed to "transfer to [JTH] the phone numbers used in connection with the Franchised Business" (ECF No. 1 ¶ 64) and failed to return "customer lists, client files, tax records, and confidential information" (*id.* ¶ 6). Attached as an exhibit to JTH's reply brief is an excerpt of the defendant's July 7 deposition transcript. ECF No. 44-2. On the last page of the exhibit, the defendant was asked whether he was required by contract "to transfer telephone numbers to Liberty." *Id.* at 8. It is not obvious whether this question referred to former Liberty customers' contact information or to the defendant's business phone number. *See* ECF No. 4 at 6 (alleging the defendant failed to "transfer" or "deliver" to JTH: customers' "phone numbers" as well as "telephone

numbers used in relation to the Franchise Business"). What *is* obvious is that JTH deliberately omitted the defendant's complete answer.

The defendant first responded that he "did try" to transfer the "numbers" to JTH, and the excerpt provided shows that JTH's attorney instructed the defendant to "just answer the question." ECF No. 44-2. But JTH cut off the transcript there, so the Court does not know how the defendant responded. Because JTH withheld this information, the Court is not comfortable drawing any conclusion about whether the breach-of-contract claim as to failure to return confidential information is likely to succeed.

Nonetheless, on the basis of the facts the defendant does not dispute, the Court concludes that JTH is likely to succeed on its breach of contract claim at trial, at least as to the defendant's non-compete obligations. Thus, the first element of the preliminary injunction assessment is satisfied.[6]

## B.     Likelihood of Irreparable Harm

A plaintiff seeking a preliminary injunction "must demonstrate more than just a 'possibility' of irreparable harm." *Di Biase*, 872 F.3d at 230 (quoting *Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir. 2013)); *see Winter*, 555 U.S. at 22 (noting that "issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy"); *Action N.C. v. Strach*, 216 F. Supp. 3d 597, 644 (M.D.N.C. 2016) (quoting

---

[6] Nothing in the Court's Memorandum Opinion and Order should be taken to suggest that the parties should not work together to resolve this matter short of trial. Indeed, as the defendant's response in opposition to this motion suggests, such a resolution may be a just outcome in this case.

*Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1267 (10th Cir. 2005)) (a preliminary injunction is not intended to "remedy past harm but to protect plaintiffs from irreparable injury that *will surely result* without their issuance") (internal punctuation omitted) (emphasis added).

Moreover, irreparable harm must be "actual and imminent," not "remote or speculative." *Di Biase*, 872 F.3d at 230 (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F2d 802, 812 (4th Cir. 1991)). "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough" to justify a preliminary injunction. *Id.* (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974)) (internal punctuation omitted). "The possibility that adequate compensatory or other corrective relief will be available at a later date . . . weighs heavily against a claim of irreparable harm." *Id.*

In support of its claim on the second element, JTH generally suggests that it will permanently lose customers if the Court does not enjoin the defendant's business. *See* ECF No. 4 at 11 (citing cases that deal with loss of customers). JTH is surely correct that "[o]nce a customer is lost to a competitor, it is difficult to win back the customer" (ECF No. 4 at 12)—and that *is* the kind of injury contemplated by the irreparable harm standard, *see, e.g.*, *Air Evac EMS, Inc. v. McVey*, 37 F.4th 89, 103 (4th Cir. 2022) (affirming the district court's finding of irreparable harm where the record showed "loss of customers and employees"); *Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*, 700 F. App'x 251, 263 (4th Cir. 2017) (finding irreparable harm where the plaintiff "had already lost customers"). But simply

alleging that one stands to lose customers is insufficient to satisfy the Supreme Court's standard for showing irreparable harm.

The *Winter* Court reviewed the holding that "a preliminary injunction may be entered based only on a 'possibility' of irreparable harm" and explicitly stated that "[t]he 'possibility' standard is too lenient." 555 U.S. at 129. The appropriate standard "requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Id.* (emphasis in original).[7] In the instant case, JTH *argues* that the defendant's conduct is presently causing it irreparable harm but provides no *proof* that such harm is more than speculative. In contrast, the defendant's assertions counter JTH's allegations and weigh against a finding of irreparable harm.

JTH attempts to show that customer loss is more than merely 'possible' by pointing to the defendant's alleged failure "to return . . . client files and confidential information." ECF No. 4 at 11. Though JTH does not specify how retention of client files would result in loss of customers, the Court understands that the defendant has greater *potential* to solicit customers away from JTH franchises if he retains those customers' personal data and tax information. The question, then, is whether JTH

---

[7] JTH relies on *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.* and its progeny, which stand for the proposition that "when the failure to grant preliminary relief creates the *possibility* of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied." 22 F.3d 546, 552 (4th Cir. 1994) (emphasis added). Contrary to JTH's assertion, *Multi-Channel* was not "abrogated on other grounds" by *Winter.* ECF No. 44 at 12. *Winter* directly rejected the irreparably injury standard articulated in *Multi-Channel.* *Winter*, 555 U.S. at 129. Thus, after *Winter*, the 'possibility' standard JTH asks the Court to apply is no longer good law.

has shown an "actual and imminent" risk that the defendant will solicit former JTH customers between now and the date of trial. *Di Biase*, 872 F.3d at 230.

JTH originally alleged "on information and belief" that the defendant "has used and continues to use [JTH]'s operations manuals and customer records to solicit [JTH]'s customers" (ECF No. 1 ¶ 65) and "is using [JTH]'s Confidential Information to unlawfully compete with [JTH]" (*id.* ¶ 66). However, after the defendant disputed those allegations (*see* ECF No. 42 at 2), JTH did not provide evidence to contradict the defendant's account. Without a statement from personal knowledge in the verified complaint (*see* ECF No. 1 ¶¶ 65–66), a countervailing affidavit, or even a denial from JTH in its reply brief (*see* ECF No. 44 at 11), the Court must credit the defendant's statements.[8]

Specifically, the Court credits the defendant's assertions that, "since the date of the termination letter," he "took all the Liberty signs down" and removed "anything mention[ing]" the brand; that he stored "the files" in a "sa[f]e area," and that he did not use JTH's "software" or "dashboard." ECF No. 42 at 2. Most importantly, absent

---

[8] That is not to say a plaintiff *could* not satisfy the preliminary injunction standard with allegations made in a verified complaint upon information and belief. "Because preliminary injunction proceedings are informal ones designed to prevent irreparable harm before a later trial governed by the full rigor of usual evidentiary standards, district courts may look to, and indeed in appropriate circumstances rely on . . . inadmissible evidence when deciding whether a preliminary injunction is warranted." *G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd.*, 822 F.3d 709, 725–26 (4th Cir. 2016), *vacated and remanded on other grounds*, 580 U.S. 1168 (2017). The Court's conclusion here is based on the fact that JTH declined to dispute the defendant's arguments refuting its initial allegations. *See Elrod v. Burns*, 427 U.S. 347, 350 n.1 (1976) (taking as true "all of the well-pleaded allegations of [the plaintiff's] complaint and *uncontroverted* affidavits filed in support of the motion for a preliminary injunction") (emphasis added).

any evidence to the contrary, and construing the defendant's pleadings liberally, it appears that the defendant has instructed Liberty customers who have called him that he cannot do business with them any longer. ECF No. 42 at 3.

Having failed to show that the defendant is actually soliciting its former customers, JTH seemingly asserts that *any* breach of a post-term non-compete agreement inherently satisfies the second element. *See* ECF No. 44 at 11. It is true that "this [c]ourt has repeatedly held that violations of the post-term covenants in Liberty's Franchise Agreements cause irreparable harm to [JTH] because they result in loss of goodwill from existing and prospective customers." However, such findings have been based on stronger evidence than JTH presents here.

Courts in this district have found irreparable harm where defendants have, for example, continued operating businesses bearing marks of the Liberty Tax brand while using JTH's proprietary software, *see JTH Tax, Inc. v. Aime*, No. 2:16-cv-279, 2016 WL 4182743, at *3 (E.D. Va. Aug. 3, 2016); used the trade name "Liberty Tax Service" to market their own competing business, *JTH Tax, Inc. v. Callahan*, No. 2:12-cv-691, 2013 WL 12146520, at *1 (E.D. Va. Aug. 27, 2013); and disclosed a "customer list to an outside party," *JTH Tax, Inc. v. Harlan C. Hanson Enterprises, Inc.*, No. 2:12-cv-625, 2013 WL 12097424, at *4 (E.D. Va. Mar. 25, 2013). JTH has also succeeded in obtaining preliminary injunctions where it has introduced evidence from witnesses "who testified about . . . the likely impact of the [the defendant's] breaches on JTH, its Liberty Tax brand, and other franchisees." *JTH Tax, Inc. v. Clark*, No. 2:11-cv-59, 2011 WL 13234318, at *1 (E.D. Va. May 6, 2011).

Most recently, in *Williams-Eton*, the court was persuaded that the defendant was "hijacking [JTH's] [m]arks and passing off their unregulated, inferior services as those of [JTH]." 2020 WL 4708705, at *4. There, JTH "supported [its claim] with evidence that [the defendants] used actual or imitative art to decorate the franchise locations and advertise after the franchise agreement was terminated." *Id*. JTH has presented no such evidence in the instant case.

On the facts presented here, the Court cannot conclude that the defendant is using JTH's trade name, *see Callahan*, 2013 WL 12146520, at *1; marks, *see Aime*, 2016 WL 4182743, at *3; software, *see id*.; "Operations Manual" (ECF No. 1 ¶ 65); "customer records" (*id*.); or "Confidential Information" (*id*. ¶ 66). The record contains no evidence that the defendant has disclosed JTH data to an outside party, *see Harlan C. Hanson Enterprises*, 2013 WL 12097424, at *4, or even once "solicit[ed] [JTH's] customers following the termination of the Franchise Agreements" (ECF No. 1 ¶ 65). Having failed to bring forth evidence to support the allegations it asserted "on information and belief," and having declined to contest the defendant's countervailing assertions, JTH has not shown that it faces a risk of irreparable harm based on the defendant "failing to return . . . client files and confidential information." ECF No. 4 at 11.

Next, JTH asserts that the defendant is causing "actual and imminent" harm by "operating Zaya Financial Group at the Franchise Location." ECF No. 4 at 11. JTH makes much of the fact that the defendant is operating his new business at the same location where he previously operated a Liberty franchise (*see, e.g.*, ECF No. 1 ¶ 59;

14

ECF No. 4 at 11), and it claims that "[s]everal federal courts have held that irreparable harm is inherent where, as here, a franchisee operates a competing business out of the same location as his former franchise" (ECF No. 44 at 13) (emphasis added). But operating a new business in the same place as a former franchise does not inherently cause irreparable harm as JTH suggests.

JTH cites *Singas Famous Pizza Brands Corp. v. New York Advert. LLC* for the proposition that "the danger of lost goodwill can be particularly true where the business operates out of the same location." ECF No. 44 at 14 (citing No. 1:10-cv-8976, 2011 WL 497978, at *8 (S.D.N.Y. Feb. 10, 2011), *aff'd*, 468 F. App'x 43 (2d Cir. 2012) (alternations omitted). It stands to reason that irreparable harm might ensue if a franchise location were converted to a nearly identical business, so that confused customers might erroneously assign their impressions of the independent business to the franchise company, resulting in loss of goodwill to the franchisor. *See Singas*, 2011 WL 497978, at *8 (discussing the risk that a restaurant that operated as "essentially a renegade Singas franchise" could harm Singas's goodwill "if that restaurant serves food that is different from the kind of food that Singas customers expect"). But such irreparable harm does not occur automatically whenever a franchise converts to an independent business at the same location—if that were true, the irreparable-harm element would always be satisfied in a franchisor's suit against a former franchisee who converts their franchise to an independent business, and it is not. *See, e.g., JTH Tax, LLC v. Shahabuddin*, 477 F. Supp. 3d 477, 485 (E.D. Va. 2020).

The *Singas* case also points to another problem with JTH's argument: To find irreparable harm based on customer confusion posing a risk to goodwill, a court requires evidence that customers would actually experience such confusion. For example, Singas provided the court "evidence of posts from internet message boards" to "show that the public appear[ed] somewhat confused as to whether the [independent] restaurant [was] a Singas franchise." 2011 WL 497978, at *9. JTH has provided no such evidence here. In fact, it has supplied some evidence to the contrary. *Compare* ECF No. 1-8 at 2 (photograph of the façade of the defendant's Liberty franchise) *with id.* at 3 (photograph of the Zaya Financial Group sign, which makes no mention of Liberty or of tax preparation services). Moreover, JTH does not dispute the defendant's allegation that he has sought to disabuse inquiring former customers of the impression that Zaya Financial Group is a Liberty franchise. *See* ECF No. 42 at 3.

JTH also cites *Petland, Inc. v. Hendrix* to suggest that "operating [a] store in the *exact same location*" as a former franchise causes irreparable harm because the independent business "serv[es] customers who, but for the presence of [their] store, might otherwise shop at [a franchise location]." ECF No. 44 at 14 (citing No. 2:04-cv-224, 2004 WL 3406089, at *6 (S.D. Ohio Sept. 14, 2004)) (emphasis supplied by the *Petland* court).

In *Petland*, the court considered the precise locations of the plaintiff's other franchises—one in the same town as the newly independent business and another "eight miles away"—in order to assess the risk the defendant posed to "the company's

efforts to re-franchise that area, as well as the greater Houston market." 2004 WL 3406089, at *6. This Court cannot engage in the kind of reasoning exhibited in *Petland*, because JTH has provided no information about the locations of its other stores in the defendant's area—and given the Fourth Circuit's guidance, the Court will not "speculat[e]" about those locations. *Di Biase*, 872 F.3d at 230 (internal citation and punctuation omitted). [9]

Finally, JTH attempts to satisfy the irreparable harm requirement by arguing that monetary damages for loss of customers at the defendant's former franchise location would be "difficult to ascertain." ECF No. 4 at 10 (citation omitted). But curiously, JTH does not assert that an unknowable number of would-be Liberty customers will have their taxes prepared instead by the defendant's independent business, before trial in this case. Instead, JTH claims "[i]t will not be possible to determine which customers went to another tax preparer *because [JTH was] not*

---

[9] JTH cites two additional cases for the proposition that courts find irreparable harm where a "franchisee operates a competing business out of the same location as his former franchise." ECF No. 44 at 13. Because both are distinguished from the facts presented here, neither is persuasive.

In *JTH Tax LLC v. Kukla*, No. 2:22-cv-1542, 2022 WL 1651074, at *3 (E.D.N.Y. Apr. 26, 2022), *report and recommendation adopted*, No. 2:22-cv-1542, 2022 WL 1645713 (E.D.N.Y. May 24, 2022), there was no appearance or opposition by the defendant, so the court lacked an unrefuted first-hand account of the kind the defendant presents here, which undercuts JTH's allegation that it is losing actual former Liberty customers because the defendant is soliciting their business.

In *Golden Krust Patties, Inc. v. Bullock*, 957 F. Supp. 2d 186, 195 (E.D.N.Y. 2013), the defendant used the plaintiff's trademarks and trade dress and even "brazenly sought to exploit plaintiffs' good will, by displaying signs that declared: 'Come in. We are Open. Nothing has Changed Only Our Name.'" As discussed *supra*, there is no evidence the defendant has engaged in any such conduct here.

*operating at the former Franchise Location*" and complains that it loses "customer relationships and revenue" "every time" customers "return[] to the location [of the defendant's former franchise] to have their taxes prepared, and Liberty is no longer branded [there]." ECF No. 4 at 12 (emphasis added). This language suggests JTH believes it is suffering irreparable harm merely because it no longer has a Liberty franchise in a location where one formerly existed.

If that is JTH's argument, it fails because the defendant's conduct is not the sole and proximate cause of the injury. The parties' contracts require the defendant to assign the lease for the franchise location to JTH at *JTH's election*. *See* ECF No. 1-1 ¶ 9.f. The defendant states—and JTH does not dispute—that he attempted to assign the lease to his business location but that JTH gave "no response." ECF No. 44-2 at 4–5; *see also* ECF No. 42 at 2 (alleging that a JTH representative told him "no that is your office and no one will come and take the [keys]"). Thus, JTH could have ensured that a Liberty storefront, a business unrelated to financial services, or no business at all stood at the site of the defendant's business—but *it* chose not to.

JTH was within its rights to decline to take over the franchise, but when it did so, any loss of customers that resulted from the absence of a Liberty franchise at that location became—at least in part—*JTH's* fault, which weakens its argument that the *defendant's* conduct is causing JTH irreparable harm. Put differently, JTH cannot have it both ways: It cannot decline to take over the defendant's lease, then blame the defendant when customers return and find a business there that is not a Liberty franchise.

Moreover, even if harm comes to JTH because the defendant still occupies the building where he formerly operated a Liberty franchise, that injury is not the kind that can justify a preliminary injunction. *Cf. Shahabuddin*, 477 F. Supp. 3d at 485 (finding no "actual evidence" of irreparable harm where JTH sought an injunction to force a former franchisee to transfer his lease, because JTH could "be compensated with money damages").[10]

For the reasons explained herein, JTH has failed to carry its burden to show that it would suffer irreparable harm in the absence of a preliminary injunction.

## C.    Balance of the Equities

Under the third element, the Court considers whether the "harm to [the defendant] resulting from the injunction . . . would outweigh the irreparable harm that [JTH] would likely suffer absent an injunction." *Mountain Valley Pipeline*, 918 F.3d at 367. JTH has failed to carry its burden to show that the balance of equities tips in its favor.

While JTH has not shown a likelihood of irreparable harm absent an injunction, there can be no doubt that the defendant is harming JTH—in the more general sense, that can be remedied by damages—by filing tax returns in violation of his contractual non-compete obligations. *See* Part III.A., *supra*. However, in support of his opposition, the defendant states that declining to grant an injunction "will not

---

[10] JTH also claims that "[t]he value of a Liberty or Siempre franchise would decline precipitously if a franchisee knew that others could, without adverse consequence, ignore their obligations under their Franchise Agreement." ECF No. 4 at 11. An award of damages at trial would adequately address this concern, so it does not affect the Court's analysis on irreparable harm. *See Di Biase*, 872 F.3d at 230.

harm [a] big company like Liberty." ECF No. 42 at 4. Construing that assertion liberally, *see Erickson v. Pardus*, 551 U.S. 89, 94 (2007), the Court understands the defendant to argue that the financial harm to JTH absent an injunction would not be greater than the financial harm to the defendant, because JTH, as a large company, has greater assets.

Since JTH terminated the franchise agreements, the defendant has filed approximately 100 individual and between 40 and 50 business tax returns from the location of the former franchise, for a total of 140–150 returns. *See* ECF No. 42-2 at 5–6. JTH makes money from franchises based on "royalties and other fees" from tax filings. ECF No. 1 ¶ 20. JTH has provided no assessment of the business value of the tax returns the defendant filed after his franchises were terminated. However, this Court's experience with another case involving a JTH franchise in Southern California, where the franchisee filed a similar number of tax returns during a similar time period, can inform a rough estimate of the revenue JTH would temporarily lose out on were the Court to decline to grant a preliminary injunction but were JTH to obtain a damages award at trial. *Cf. JTH Tax, LLC v. White*, 2:22-cv-272, 2023 WL 3321737, at *6 (E.D. Va. May 9, 2023) (awarding $21,451.95 as a default judgment based on a Los Angeles former franchisee filing 193 tax returns after her franchise was terminated in September 2021). For a company that boasts "2,500+ retail branches and 12,000+ tax professionals across the United States and Canada," waiting on such a sum of money pending the outcome of a trial or settlement is not a grave burden. Liberty Tax, https://perma.cc/3UNV-JTJH (last visited Sept. 22, 2023).

In contrast, the defendant estimates that tax preparation constitutes 20 percent of his current business. *See* ECF No. 42 at 5. He offers tax services "[p]art time" (ECF No. 42 at 4)—presumably to supplement his income, which he uses to "take care of" his 85-year-old mother and his "brother [who] just came from Syria" (*id.* at 3).

JTH argues that "enforcing the non-compete [agreement] will not substantially harm [the defendant] because he is free to provide the payroll, bookkeeping and audit services, which constitute 80% of his income." ECF No. 44 at 16. This argument is flawed in two ways: First, it assumes the defendant's income is sufficient for him and his family to sustain a 20% reduction for two years. But the defendant admitted to owing JTH approximately $50,000 as of two months ago (ECF No. 44-2 at 6), and according to JTH, the figure is at least twice that (*see* ECF No. 1 ¶ 4 (alleging $115,944.85 in unpaid fees)). It is hard to see how an individual business owner in that financial situation could sustain a 20% pay cut as easily as JTH could sustain a delay in a damages award from a single franchisee out of thousands. Indeed, it appears to the Court that this lawsuit arose in large part *because* the defendant lacked the resources to pay JTH's fees.

Second, the burden on the defendant could very well be greater than the 20% income reduction JTH assumes. JTH's argument disregards the possibility that the defendant's customers might obtain more than one type of financial service at his business and that, therefore, he might lose "payroll, bookkeeping, and audit"

customers (ECF No. 44 at 16) if those customers are no longer able to obtain a full complement of business financial services from the defendant's shop.

The Court finds that the "harm to [the defendant] resulting from the injunction . . . would outweigh the irreparable harm that [JTH] would likely suffer absent an injunction." *Mountain Valley Pipeline*, 918 F.3d at 367. Thus, JTH has failed to carry its burden to show that the balance of equities tips in its favor.

* * *

For the Court to grant a preliminary injunction, "[e]ach preliminary injunction factor—likelihood of success, irreparable harm, the balance of equities, and the public interest—must be satisfied as articulated." *Stinnie*, 77 F.4th at 208 (internal citations and punctuation omitted). Therefore, having concluded that JTH has failed to show that it would suffer irreparable harm absent a preliminary injunction or that the balance of equities tips in its favor, the Court declines to reach the public-interest element. *See Henderson for Nat'l Lab. Rels. Bd. v. Bluefield Hosp. Co., LLC*, 902 F.3d 432, 439 (4th Cir. 2018) (holding that a district court need not "mechanically consider all four . . . factors if one is clearly absent"); *see also Downing*, 2017 WL 11489270, at *3 (declining to reach all the remaining elements where the "[p]laintiff ha[d] not satisfied two of the four elements necessary for a preliminary injunction"). The motion for a preliminary injunction is **DENIED.**

The defendant is **ADVISED** that this ruling does *not* mean the Court has decided the entire case in his favor, nor does it mean that the defendant can freely continue to provide tax preparation services through Zaya Financial Group. Even

though the Court is not yet ordering the defendant to stop offering tax services, the defendant's contracts require that he not provide tax preparation services or file tax returns from the location of his former franchise—or from anywhere within 25 miles of that location—until January 26, 2024. As the Court explained in Part III.A., JTH will probably succeed in proving that the defendant violated his contract by filing taxes through Zaya Financial Group. Therefore, if the defendant continues to offer tax services at the location of his former franchise as he has been doing, a jury may require him to pay even more damages later. Additionally, the Court could, through the issuance of a permanent injunction, order the defendant to shut down the tax preparation part of his business for even longer than the contract originally required.

## IV.    CONCLUSION

Plaintiff JTH Tax, LLC's Motion for Preliminary Injunction (ECF No. 3) is **DENIED.**

The Clerk is **DIRECTED** to send a copy of this Memorandum Opinion and Order to the defendant and to all counsel of record.

**IT IS SO ORDERED.**

/s/

Jamar K. Walker
United States District Judge

Norfolk, Virginia
September 27, 2023